ISMERT AND ASSOCIATES, INC.,
Plaintiff, Appellant,

v.

NEW ENGLAND MUTUAL LIFE
INSURANCE COMPANY,
Defendant, Appellee.

No. 85–1972.

United States Court of Appeals,
First Circuit.

Heard March 3, 1986.
Decided Sept. 19, 1986.

Gordon T. Walker with whom John Traficonte and McDermott, Will & Emery, Boston, Mass., were on brief for plaintiff, appellant.

Robert E. Sullivan, Boston, Mass., with whom David P. Novello, Lexington, Mass., and Palmer & Dodge, Boston, Mass., were on brief for defendant, appellee.

Before COFFIN and BREYER, Circuit Judges, and MALETZ,* Senior Judge.

MALETZ, Senior Judge.

Plaintiff-appellant Ismert & Associates, Inc. (Ismert) appeals from the district court's entry of summary judgment on behalf of defendant-appellee New England Mutual Life Insurance Company (NEL) and from the subsequent denial of Ismert's motion for relief from judgment. We affirm.

* Of the United States Court of International Trade, sitting by designation.

## I. *Introduction*

This case stems from the dissolution of a business relationship between Ismert and NEL. In its complaint, Ismert alleged that NEL was liable for breach of contract, unfair or deceptive trade practices, violation of the Sherman Act, and tortious interference with contract and advantageous business relationships. In addition to denying Ismert's major allegations, NEL asserted an affirmative defense of release. Ismert, in its responding papers,[1] did not deny the existence of a document purporting to be a release and executed by both parties, but contends that there are disputed issues of fact as to whether that document constitutes a release. In the alternative, Ismert argues that any release is void for duress. Finally, it argues that even assuming there is in existence a binding release, the terms of that release do not extinguish all of its claims. The district court found that Ismert had released its claims; that Ismert could not avoid the release for duress; and that the release barred all the claims raised. This appeal followed.

## II. *Standard of Review*

To survive NEL's motion for summary judgment, Ismert must establish that there is a genuine issue of material fact requiring a trial. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* —— U.S. ——, ——, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *see* Fed.R.Civ.P. 56(c). In determining whether Ismert has met this burden, we must "determine whether any further exploration of the facts is really necessary." *Johnson v. Educational Testing Service,* 754 F.2d 20, 25 (1st Cir.) (quoting *Packish v. McMurtrie,* 697 F.2d 23, 27 (1st Cir.1983) ), *cert. denied,* —— U.S. ——, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985). Summary judgment is appropriate if the facts upon which Ismert relies to support its allegations are not susceptible of the interpretation it seeks to give them. *Kaz-*

*maier v. Wooten,* 761 F.2d 46, 49 (1st Cir. 1985); *see Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (standard for summary judgment is identical to standard for directed verdict; summary judgment should be granted if there can be but one reasonable conclusion); *Boston Five Cents Savings Bank v. Secretary of HUD,* 768 F.2d 5, 8 (1st Cir.1985) (if no reasonable person could differ about the issues in case, there is no genuine factual issue left for a jury to decide); *see generally Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On the other hand, we must reverse the grant of summary judgment if issues of fact that were adequately raised below must be resolved before the legal issues may be decided. *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985, 986 (1st Cir.1983).

As we are required to do, we view the facts in the light most favorable to Ismert, the party that opposed the motion, indulging all inferences favorable to that party. *See Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). This standard of review applies regardless of the outcome below. *Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir.1985).

## III. *Background*

### A. *The Relationship Between the Parties*

NEL is a mutual life insurance company organized under Massachusetts law; Ismert, a Missouri corporation, is a property tax consulting service that identifies over-appraised business properties and pursues tax reduction applications on behalf of the property owners. It earns contingency

---

1. NEL's motion for summary judgment was initially unopposed and was granted by the district court on August 5, 1985. Ismert then filed a motion for relief from judgment. The district court deferred judgment on that motion, allow-

ing Ismert an opportunity to submit papers in opposition to the summary judgment motion. The court then, in a memorandum and order, denied Ismert's motion for relief from judgment and reaffirmed its grant of summary judgment.

fees for successful applications. Ismert initially marketed its consulting service through various life insurance agents, including some agents from NEL. That changed in 1982, when Ismert and NEL entered into a marketing agreement that gave NEL agents the exclusive right to promote and sell Ismert's service. In connection with that agreement, NEL loaned money to Ismert and obtained an option to buy up to 50% of Ismert's common stock. NEL's General Agents were to receive 15% of Ismert's gross fees attributable to their sales of the Ismert service.

## B. *Deterioration of the Relationship*

Shortly after the parties entered into these agreements, their relationship began to deteriorate. According to Ismert, NEL became concerned about the loyalty of the NEL agents and its capacity to control them, and therefore disparaged Ismert's program to the agents and coerced and dissuaded them from selling Ismert's service. Ismert also asserts that NEL violated its obligation to provide marketing support. It contends that these acts and omissions drove Ismert to the brink of bankruptcy since Ismert had severed all non-NEL sales relationships and was totally dependent on the now unproductive NEL relationship for its revenue.

Sometime in 1983, Fred Ismert (Mr. Ismert), president of the company bearing his name, informed NEL that Ismert would not renew the exclusive marketing agreement when it expired in November 1983. He also notified NEL's assistant counsel, Mary Counihan Livingston, that because of NEL's breach of contract, Ismert would not be able to repay NEL on the terms set forth in the parties' original loan agreement. Mr. Ismert advised Ms. Livingston that if Ismert were required to make payments under the existing agreement, it would be forced to file for bankruptcy. He requested that NEL investigate Ismert's financial condition so that the parties could then agree on a new repayment schedule.

According to Mr. Ismert, Ms. Livingston told him he would have to execute a release preventing Ismert from suing NEL. When Mr. Ismert responded that his company's poor financial condition was the result of NEL's own actions, Ms. Livingston allegedly retorted that Ismert would do what it was told or suffer the consequences. Auditors employed by NEL subsequently determined that Ismert's financial situation was precarious and that it could not meet its debt obligations.

## C. *Negotiations on Termination of the Relationship*

In September 1983, NEL sent Ismert drafts of four proposed agreements, each indicating an effective date of May 1, 1984: a release; an agreement to terminate the exclusive agency agreement; a cancellation of the stock option agreement; and a modification and extension agreement easing Ismert's loan repayment obligations. NEL's letter accompanying these four drafts noted that it was: "RE: Rough Draft of Documents pertaining to the termination of the business relationship between Ismert and New England Life." Various modifications to the language of the four documents were proposed by each of the parties throughout the remaining months of 1983. In January 1984, Ismert proposed a substantial restructuring of the proposed loan modification agreement, and negotiations continued. On June 22, 1984, NEL sent Ismert new proposed drafts of the loan modification agreement and of the document that would cancel NEL's stock option; on July 3, 1984, it sent Ismert new drafts of the release and of the document that would terminate the exclusive agency agreement. Toward the end of July, the loan modification agreement and the stock option cancellation agreement were executed by Mr. and Mrs. Ismert and by NEL. Under the loan modification agreement, the Ismert debt was to be paid off at rates significantly lower than those originally agreed upon.[2]

---

**2.** The original loan agreement had required payments of approximately $35,000 per month be-

ginning January 1984. Under the modification agreement, Ismert's debt, at that point equal to

Both before and after the signing of the stock option cancellation and loan modification agreements, the parties exchanged proposed drafts of a release. Affidavits submitted by the parties reflect disagreement over precisely what clauses in the various draft releases were the subject of contention. Mr. Ismert's affidavit indicates that the primary dispute centered around a clause in paragraph 5, insisted upon by NEL, providing that "nothing herein shall be construed to prevent NEL from designating the products and services which its fieldforce shall sell." Mr. Ismert feared that such a provision would preclude NEL agents from marketing Ismert's services on a non-exclusive basis after termination of the exclusive marketing agreement. Ms. Livingston's affidavit indicates that, to the contrary, the dispute concerned language allegedly added by Mr. Ismert to a portion of paragraph 5 that barred the parties from making libelous statements against each other. It appears that there was no substantial dispute over any clauses in the draft releases other than these two.

In July 1984, Ismert's counsel, Larry Welch, made handwritten changes on a draft proposed by NEL,[3] including the addition of language at the end of paragraph 5 indicating that nothing in the release would prevent Ismert from marketing its services through anyone not a party to the release. Following receipt of the draft containing his counsel's changes, Mr. Ismert drew up a new draft in which he incorporated all the suggested changes except one. Specifically, instead of adding to paragraph 5 the language suggested by Mr. Welch, Mr. Ismert simply deleted from that paragraph the language originally proposed by NEL to the effect that NEL could designate the services to be marketed by its agents. Mr.

Ismert then signed this redrafted release and, on or about July 24, 1984, mailed it to NEL together with an executed document that by its terms would terminate the exclusive agency agreement. His accompanying letter stated: "You will note there were some minor changes to these documents recommended by my counsel, Mr. Welch."

After NEL received this executed release ("July 24 release") and the executed agreement to terminate the exclusive agency, Ms. Livingston spoke with Mr. Welch on the telephone and discussed the drafts of the release and the agreement to terminate. According to Mr. Welch's affidavit, Ms. Livingston indicated that the proposed July 24 release was not acceptable because NEL would not agree to a release that limited its right to designate the products and services sold by its sales force. Ms. Livingston states in her affidavit, however, that her only suggested change to the July 24 release concerned language that had been added by Mr. Ismert to the libel provision. She asserts that during her telephone conversation with Mr. Welch he agreed to a version of the release without that language, and that she subsequently sent Mr. Ismert a new draft release and agreement to terminate the exclusive agency, each of which incorporated the changes orally agreed to by Mr. Welch.

Mr. Ismert states that he had not added new language to the libel provision, and that the language in the libel provision to which Ms. Livingston now claims to have objected had been in every release proposed by NEL since the beginning of the negotiations. He also states that he does not believe he received the new draft release Ms. Livingston claims to have sent

---

$440,000, was divided into two notes, with Ismert to pay off the "A" Note, which accrues interest at an annual rate of 9%, by payments of $2,200 per month. The "B" Note carries no interest and is to be paid in full by April 1, 1991.

**3.** According to Ismert, paragraph 5 of the draft release proposed by NEL provided, in full:

The parties agree that neither party shall make any libelous, slanderous, or otherwise disparaging remarks about the other to third parties concerning any of the matters contained herein which could be construed, in the opinion of the party so libeled, slandered or otherwise disparaged, to reflect adversely upon that party's business or personal reputation, except that nothing herein shall be construed to prevent NEL from designating the products and services which its fieldforce shall sell.

following her discussion with Mr. Welch. However, both NEL and Ismert agree that in a letter of August 31, 1984, Ms. Livingston requested that Mr. Ismert sign the release that she had sent to him. In that letter she also stated: "As you know, the renegotiation of your loan repayment depends upon a satisfactory Release being concluded in this matter."

Mr. Ismert alleges that in response to the August 31 letter, he called Ms. Livingston the following month. He claims that during this call Ms. Livingston urged him to sign a release proposed by NEL, and that he emphatically stated that he would not give NEL *any* release. Mr. Welch claims that then, on September 27, Ms. Livingston called him and "expressed her anger and frustration concerning the negotiations with Ismert about the Release and his refusal to sign. [She] stated that she had talked with Fred Ismert and that he had said that he refused to sign any release. Even though Fred Ismert apparently had just told [her] that he would not give NEL any Release, [she] stated that NEL intended to execute a proposed Release already signed by Fred Ismert and mailed to NEL sometime in July, 1984." Welch affidavit para. 8.

A few days later, on or about October 1, 1984, NEL executed the July 24 release and the document terminating the exclusive agency agreement, both of which previously had been executed by Mr. Ismert. Ms. Livingston sent these documents to Mr. Welch with a letter stating in part: "Enclosed are copies of the above two documents executed by Ismert and New England Life. Since all documents now have been executed, this matter is now closed." Mr. Welch acknowledged receipt of the documents a month later by a letter stating: "I would request, on behalf of Ismert & Associates, Inc., a duplicate original of those documents for his [*sic*] file." There were no subsequent communications between NEL and Ismert regarding the release.

### D. *District Court Opinion*

The district court found there was no genuine issue of material fact as to the existence of a release and therefore granted summary judgment for NEL. It reasoned that a release and the loan renegotiation agreement had been "connected in both parties' minds"; that Ismert could not accept the benefits of a contract that had resulted in a favorable loan renegotiation while evading the responsibilities of that contract; and that the course of dealings between the parties had demonstrated their agreement on the July 24 release. Thus, the court stated: "Ismert cannot, after having accepted the benefit of the release, escape its burdens by raising a cloud of smoke about whether haggling over a particular phrase that is irrelevant to this action precluded a valid release from having been executed." *Ismert & Associates, Inc. v. New England Mutual Life Insurance Co.*, No. 85-0997-MA, slip op. at 7 (D.Mass. Nov. 19, 1985). As for Ismert's contention that the release, even if agreed upon by the parties, is voidable for duress, the court held that Ismert had not made out a factual basis for a duress claim and that, in any event, Ismert had affirmed the release by acceptance of benefits. *Id.* at 8.

For the reasons that follow, we conclude that Ismert's initial promise to enter into a release must be specifically enforced. Moreover, a majority of the panel finds that Ismert has failed to make out a factual basis for its claim of duress. Therefore, we affirm the district court's grant of summary judgment.

### IV. *Existence of a Release*

#### A. *The July 24 Release*

"The interpretation of releases is governed by principles of contract law." *Bank of America National Trust & Savings Association v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir.1985); *accord Bartel Dental Books Co. v. Schultz*, 786 F.2d 486, 488 (2d Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 3298, 92 L.Ed.2d 713 (1986); Restatement (Second) of Contracts § 284 comment c (1981). Under Massachusetts law, which governs this action, where there is conflict-

ing testimony on the question of whether a contract has been created, the issue is one for the jury. *Kinchla v. Welsh,* 8 Mass. App.Ct. 367, 370, 394 N.E.2d 978, 981 (1979). " 'Ordinarily the question of whether a contract has been made is one of fact. If the evidence consists only of writings, or is uncontradicted, the question is for the court; otherwise it is for the jury.' " *David J. Tierney, Jr., Inc. v. T. Wellington Carpets, Inc.,* 8 Mass.App.Ct. 237, 239, 392 N.E.2d 1066, 1068 (1979) (quoting *Bresky v. Rosenberg,* 256 Mass. 66, 75, 152 N.E. 347, 351 (1926) ). We find that, on this record, it cannot be said that as a matter of law the signed *July 24* release constitutes an agreement between the parties and so an actual release of Ismert's claims.

It is fundamental that a contract is formed upon acceptance of an offer. *Houston Dairy, Inc. v. John Hancock Mutual Life Insurance Co.,* 643 F.2d 1185, 1186 (5th Cir.1981). Ismert's act of sending the partially executed July 24 release to NEL constituted an offer of a release on the specific terms contained in that document. NEL appears to have rejected that offer, however, by virtue of Ms. Livingston's statement to Mr. Welch that the release was unacceptable and by her subsequent transmittal to Mr. Ismert (according to NEL's own version of the facts) of a different proposed release together with a letter seeking his signature on that release. A counter-offer made upon receipt of an offer generally terminates the party's power to accept the original offer. *See Peretz v. Watson,* 3 Mass.App.Ct. 727, 728, 324 N.E.2d 908, 909 (1975); Restatement (Second) of Contracts § 39(2) (1981). Furthermore, Mr. Ismert appears to have withdrawn his offer of the July 24 release by his later statement to Ms. Livingston that he would not sign *any* release. *See Onanian v. Leggat,* 2 Mass.App.Ct. 623, 630, 317 N.E.2d 823, 828 (1974) (fundamental rule is that unaccepted offer may be withdrawn at any time before acceptance). Given these facts, viewed in the light most favorable to Ismert, NEL was no longer empowered to accept Ismert's offer, and its

subsequent execution of the July 24 release constituted only a counter-offer. *See, e.g., Beaumont v. Prieto,* 249 U.S. 554, 556, 39 S.Ct. 383, 384, 63 L.Ed. 770 (1919) (Holmes, J.); *Champlin v. Jackson,* 317 Mass. 461, 462, 58 N.E.2d 757, 758 (1945); *Lawrence v. Rosenberg,* 238 Mass. 138, 141, 130 N.E. 189, 190 (1921).

Only if Ismert accepted that counter-offer was there a meeting of the minds on the July 24 release. *See Kurio v. United States,* 429 F.Supp. 42, 64 (S.D.Tex.1970) (contract will arise if conduct by an original offeror following receipt of late acceptance of original offer amounts to acceptance of counter-offer implicit in late attempt to accept); *Beech Aircraft Corp. v. Flexible Tubing Corp.,* 270 F.Supp. 548, 558 (D.Conn.1967) (under normal circumstances, silence alone does not constitute an expression of acceptance of counter-offer, but positive acts may constitute acceptance).

Unquestionably, Ismert never explicitly accepted NEL's counter-offer of the terms of the July 24 release. However, an offer may be accepted by overt acts. *See Abalan v. Abalan,* 329 Mass. 182, 183–84, 107 N.E.2d 302, 303 (1952) (to lead a person reasonably to suppose that you assent to an oral arrangement is to assent to it); *O'Donnell v. Clinton,* 145 Mass. 461, 463, 14 N.E. 747, 751 (1888) (same; assent is a matter of overt acts); *Greany v. McCormick,* 273 Mass. 250, 253, 173 N.E. 411, 412 (1930) (acceptance may be indicated by acts as well as words); 1 S. Williston, A Treatise on the Law of Contracts § 22A (W. Jaeger 3d ed. 1957) (modern law rightly construes both acts and words as having the meaning which a reasonable person would put upon them in view of the surrounding circumstances). Indeed, under certain circumstances, acceptance may come about as a result of silence, or of silence in conjunction with acts. *See Hobbs v. Massasoit Whip Co.,* 158 Mass. 194, 197, 33 N.E. 495, 495 (1893); *Gateway Co. v. Charlotte Theatres, Inc.,* 297 F.2d 483, 486 (1st Cir.1961). Hence, a course of dealings between parties may make it reasonable

that if the offeree is rejecting an offer or counter-offer, it should so indicate. *See* Restatement (Second) of Contracts § 69(1)(c) & comment d (1981).

▪ Possibly, the nature of the lengthy negotiations between the parties, considered in conjunction with the original agreement and with the facts surrounding the receipt by Mr. Welch of the fully executed July 24 release, including his request of a copy of the letter for his files, could be understood as constituting an acceptance by acts of NEL's counter-offer of the terms of the July 24 release. Indeed, the district court found that although Mr. Welch's letter of November 1 acknowledging receipt of the fully executed release was "somewhat ambiguous, [it] could be viewed as acceptance by the reasonable person." Slip op. at 8. However, we cannot say as a matter of law that Mr. Welch's letter and the accompanying circumstances amounted to an acceptance. *See Charbonnages de France v. Smith,* 597 F.2d 406, 414–15 (4th Cir.1979) (dispute about whether a contract has been formed as result of words and conduct over a period of time presents interpretive issues traditionally understood to be for the trier of fact); *Construction Aggregates Corp. v. Hewitt-Robins, Inc.* 404 F.2d 505, 509–10 (7th Cir. 1968) (where defendant sent letter predicating its acceptance of an offer upon certain modifications and plaintiff did not object in writing, and orally requested that one change be made in the proposed modifications, it was jury question as to whether letter was a counter-offer that had been accepted by the plaintiff), *cert. denied,* 395 U.S. 921, 89 S.Ct. 1774, 23 L.Ed.2d 238 (1969); *Songbird Jet, Ltd. v. Amax Inc.,* 581 F.Supp. 912, 921 (S.D.N.Y.1984) (it was not court's function on motion for summary judgment to consider whether acts and circumstances established a contract).

## B. *Enforcement of Promise to Release*

▪ Although the July 24 release does not constitute a binding release, we find that Ismert's original promise to execute a release—a promise for which Ismert received the bargained-for consideration—must be specifically enforced.

It is clear from the record that Ismert initially entered into an oral agreement to release in the future its claims against NEL as consideration for NEL's promise to enter into three other agreements, including the loan renegotiation agreement. A promise to agree upon a release in the future is not itself a release. *See* Restatement (Second) of Contracts § 284 comment a (1981) (a promise to discharge in the future an existing duty creates a new duty that can itself be discharged by the parties but is not itself a release; a release must take place immediately or upon occurrence of a condition). Nonetheless, such a promise may be specifically enforced. *See Peters v. Wallach,* 366 Mass. 622, 628, 321 N.E.2d 806, 810 (1975) (executory agreement to settle preexisting claim that required execution of release could be specifically enforced against party that subsequently refused to release claim); *Warner v. Rossignol,* 513 F.2d 678, 682–83 (1st Cir.1975) (a compromise agreement is an enforceable contract, and agreement requiring release in exchange for payment could be specifically enforced if there was no repudiation or breach of the agreement); *Read v. Baker,* 438 F.Supp. 737, 741 (D.Del.1977) (where party refused to sign release required by settlement agreement, court specifically enforced agreement), *aff'd mem.,* 577 F.2d 728 (3d Cir.), *cert. denied,* 439 U.S. 869, 99 S.Ct. 197, 58 L.Ed.2d 180 (1978).

Of course, if a contract is to be specifically enforced, it is necessary that its essential terms be sufficiently definite that the nature and extent of the parties' obligations can be ascertained. *See Lucey v. Hero International Corp.,* 361 Mass. 569, 574–75, 281 N.E.2d 266, 270 (1972) (an agreement to enter into a contract which leaves the terms of that contract for future negotiations is too indefinite to be enforced); *Air Technology Corp. v. General Electric Co.,* 347 Mass. 613, 626, 199 N.E.2d 538, 548 (1964) (purported contract that does not adequately specify essential

terms ordinarily is unenforceable); *Simons v. American Dry Ginger Ale Co.*, 335 Mass. 521, 523, 140 N.E.2d 649, 652 (1957) (contract is not unenforceable if, when applied to transaction and construed in light of attending circumstances, its meaning can be ascertained with reasonable certainty). Here, the essential terms of the agreement between NEL and Ismert became sufficiently definite to be enforceable. The record is clear that Ismert promised not to bring suit on claims arising out of its arrangement with NEL in exchange for NEL's promise to enter into three other contracts, including a favorable loan renegotiation agreement. To the extent that the essential terms of this initial agreement were not sufficiently definite, they became so by virtue of the parties' subsequent agreement on the specific terms of the loan renegotiation contract. *See Fibreboard Products, Inc. v. Townsend*, 202 F.2d 180, 182 (9th Cir.1953) (contract became sufficiently definite to be enforceable by virtue of subsequent conversation between the parties that made agreement specific); *cf. Cataldo v. Zuckerman*, 20 Mass.App.Ct. 731, 737, 482 N.E.2d 849, 853–54 (1985) (essential terms of contract in memorandum were in sufficiently definite form that nature and extent of obligations could be ascertained); 1 S. Williston, A Treatise on the Law of Contracts § 45, at 149 (W. Jaeger 3d ed. 1957) (where essential element is reserved for future agreement, promise gives rise to legal obligation upon such future agreement). Consequently, the essential terms of the initial agreement have become sufficiently definite to be enforced.

In view of Ismert's promise of a release, made as part of an initial enforceable agreement under which NEL has fully performed, we conclude that Ismert's promise must be specifically enforced. Accordingly, in the absence of its duress defense, which is discussed below, Ismert is foreclosed from pursuing this action.[4] *Cf. Coz*

*Chemical Corp. v. Riley*, 9 Mass.App.Ct. 564, 568, 403 N.E.2d 145, 148 (1980) (Massachussetts law will not permit the injustice of the other party retaining a benefit unless compelled by some inexorable rule).

## V. *Economic Duress*

Ismert contends that even if it entered into a release, summary judgment is inappropriate, because the release was procured by duress and is therefore invalid. The district court rejected the duress theory for the following reasons:

> Ismert's final argument is that if a valid release were executed, Ismert signed it under duress. There is no factual support for this claim. The parties negotiated the termination and release over a substantial period of time, Ismert was represented by counsel, and Ismert requested and obtained significant changes in the documents. Furthermore, Ismert cannot avoid a contract for duress, if after the duress ends, it manifests to the other party its intention to affirm by, for example, accepting the benefits of the deal. *See* Restatement (Second) Contracts, § 380(1) (1981).

Slip op. at 8. In short, the district court held that (1) Ismert's affidavits and exhibits did not make out a claim of duress and (2) even if they did, the release was at best voidable, and Ismert failed to avoid it.

The majority of the panel agrees with the district court that Ismert has not made out a claim of duress. The reasoning of the majority is set forth in the separate opinion of Judge Breyer, in which Judge Coffin concurs. The author of this opinion believes, however, that Ismert has made out a claim of duress. Accordingly, part V of this opinion represents the dissenting view of its author.

### A. *Elements of Duress*

The leading Massachusetts case on economic duress is *International Underwater*

---

4. Ismert contends that even if it is found to have released NEL as to some of Ismert's claims, its release does not bar *all* the claims pleaded by Ismert in this action. The contention is without

merit. For the record viewed as a whole makes clear that Ismert's promise to release NEL encompassed all such claims.

*Contractors v. New England Telephone & Telegraph Co.*, 8 Mass.App.Ct. 340, 393 N.E.2d 968 (1979). In that case, the plaintiff, International Underwater, alleged that while it was performing under a contract calling for the assemblage and installation of certain conduits in the Mystic River the defendant insisted on deviation from the contract. The defendant assured plaintiff that it would pay the additional cost, which was substantially greater than the original, if plaintiff would complete the work. It then refused to make payments for almost a year, causing plaintiff's financial difficulties, and then made a settlement offer on a "take-it or leave-it basis." The plaintiff accepted the offer and signed a release. The appeals court reversed an entry of summary judgment for the defendant, finding genuine issues of material fact with regard to plaintiff's contention that it had signed the release as a result of economic duress. The court stated:

> To show economic duress (1) a party "must show that he has been the victim of a wrongful or unlawful act or threat, and (2) such act or threat must be one which deprives the victim of his unfettered will." Williston, Contracts § 1617, at 704 (3d ed. 1970). "As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values." *Ibid.*

> The elements of economic duress have also been described as follows: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party."

*Id.* at 342, 393 N.E.2d at 970 (quoting *Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382, 389, 187 Ct.Cl. 15 (1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970)). Amplifying the latter factor, i.e., that the circumstances must have been caused by the opposite party, the court held that the mere taking advantage of financial difficulty is not du-

ress, unless the party taking advantage contributed to or caused that financial difficulty. *Id.* at 342, 393 N.E.2d at 970.

The court in *International Underwater* found it significant that, while defendant's engineers had recommended a settlement of $775,000, the defendant ultimately offered plaintiff only $575,000, a fact suggesting that there may have been a "disproportionate exchange of values" sufficient to support a claim of duress. *Id.* at 346, 393 N.E.2d at 972. The court rejected the defendant's argument that International Underwater had had an adequate legal remedy short of signing the release and then seeking to avoid it, noting that " 'if recourse to courts of law is not quick enough to save the victim's business or property interests, there is no adequate legal remedy.' " *Id.* (quoting 13 S. Williston, A Treatise on the Law of Contracts § 1671, at 709 (W. Jaeger 3d ed. 1970)).

### B. *NEL's Attempts to Distinguish International Underwater*

Ismert relied heavily on *International Underwater* in its arguments below, but the district court did not address the case. NEL attempts to distinguish *International Underwater* on the following grounds: (1) NEL did not demand that Ismert accept anything less than that to which it had previously agreed, whereas International Underwater had had to accept $200,000 less than the amount initially agreed upon by representatives of the defendant (in a settlement later rejected by defendant's board); (2) Ismert was represented by counsel, whereas the opinion in *International Underwater* does not indicate that International Underwater was represented by counsel during negotiations; (3) a showing of mere hard bargaining positions does not constitute duress in the absence of any wrongful pressure by NEL; and (4) the language of Mr. Ismert's July 23, 1984 letter to Ms. Livingston, set forth in the margin,[5] proves there was no duress.

5. Dear Mary:

I have enclosed executed copies of the Release and Agreement to Terminate "Exclusive Agen-

I do not find NEL's proffered distinctions persuasive. Ismert's affidavits indicate that it terminated all its other sales agency contracts in reliance on an exclusive contract with NEL; that it borrowed $360,000 from NEL to train NEL agents in marketing the Ismert service and to make Ismert a national operation; that NEL breached its contract with Ismert by failing to support Ismert's marketing efforts and by disparaging the Ismert service to NEL agents; that Ismert faced financial collapse brought about by its dependence on NEL, and by NEL's wrongful conduct; that NEL knew that Ismert was on the brink of bankruptcy because of its inability to repay the NEL loan on schedule; and that NEL required Ismert to execute a release if it wished to avoid bankruptcy.[6] Given all this, NEL's four attempts to remove this case from the scope of *International Underwater* are insufficient.

### 1. *Disproportionate Exchange of Values*

Plaintiff in *International Underwater* alleged that it gave up $200,000 and signed a release under duress because defendant's wrongful conduct placed it in a weakened bargaining position. The wrongful acts alleged were insistence on a deviation from the parties' initial contract and refusal to make progress payments for almost a year, 8 Mass.App.Ct. at 344, 393 N.E.2d at 971, not—as NEL argues—the refusal by New England Telephone's board to approve the tentative $775,000 settlement.

*International Underwater* viewed the plaintiff's sacrifice of $200,000 as raising a possibility of the requisite disproportionate exchange of values. Here, too, there may have been a disproportionate exchange of values since Ismert may have released legitimate damage claims in amounts far in excess of the benefits it obtained under the renegotiated loan agreement.

### 2. *Representation by Counsel*

It is true that some courts and commentators have viewed a party's representation by counsel as a relevant factor in evaluating claims of duress. *See Anselmo v. Manufacturers Life Insurance Co.*, 771 F.2d 417, 420 (8th Cir.1985) (plaintiff consulted with his wife and attorney before signing release; in any event, plaintiff ratified contract, thereby waiving any duress claim); *cf. Naukeag Inn, Inc. v. Rideout*, 351 Mass. 353, 357, 220 N.E.2d 916, 919 (1966) (release cannot be avoided on theory of breach of fiduciary relationship where, among other things, negotiations were at arm's length and parties had independent legal advice); Restatement (Second) of Contracts § 175 comment c (1981) ("such factors as the availability of disinterested advice and the length of time that elapses between the making of the threat and the assent may also be relevant in determining whether the threat actually induced the assent").

*International Underwater* does not discuss whether representation by counsel should be a factor in evaluating a duress claim.[7] However, that case emphasizes deprivation of the victim's unfettered will and the unavailability of alternatives to the coercive offer. 8 Mass.App.Ct. at 342, 393 N.E.2d at 970. Even the best legal advice may not be able to create an alternative to a coercive offer. Thus, while representation by counsel may be a factor for the

---

cy Agreement". You will note there were some minor changes to these documents recommended by my counsel, Mr. Welch. Please contact me after you have had the opportunity to review these documents.
Kind Regards,
Fred Ismert
President

**6.** The majority reasons that Ismert's loan obligations did not present an imminent threat of bankruptcy, because Ismert could have stopped making payments and waited for NEL to sue, at which point Ismert could have raised its claims against NEL in defense. Alternatively, the majority argues, Ismert could have refused to sign a release and brought its own action. I shall explain below why I believe Ismert has made out a valid claim of duress, even if bankruptcy were not imminent.

**7.** The opinion of the appeals court does not indicate whether plaintiff was represented by counsel during the negotiations.

trier of fact to consider, it cannot in itself bar a claim of duress.

### 3. *Wrongful Pressure*

NEL further argues that mere hard bargaining between parties of disparate size does not rise to the level of economic duress. There are two answers to this contention: first, *International Underwater* holds that "unequal bargaining power" based on "comparative size and resources ... *is* a factor to be considered in determining whether the transaction involved duress," *id.* at 346, 393 N.E.2d at 972 (emphasis added); second, Ismert alleges that NEL's wrongful acts caused the financial distress then exploited by NEL. It therefore has alleged the use of wrongful pressure by NEL, and not merely that NEL had greater bargaining leverage.

### 4. *Mr. Ismert's July 23, 1984 Letter*

Nor can I agree with NEL's contention that there is anything in Mr. Ismert's July 23, 1984 letter to Ms. Livingston, *supra* note 5, that necessarily demonstrates an absence of duress, despite the fact that the tone of that letter is civil and mentions only "minor changes" proposed by Ismert's attorney. A party entering into a contract as a consequence of economic duress may find it useful to seek the least onerous contractual terms possible, and to address the opposite party in amicable terms. NEL's argument that the letter demonstrates an absence of duress is for the factfinder.

### C. *The Majority's Treatment of International Underwater*

The majority of this panel holds that this case is distinguishable from *International Underwater* because it concludes that Ismert cannot demonstrate that acceptance of NEL's offer was its only reasonable option. I do not dispute the majority's statement that the presence of an adequate legal remedy undermines claims of economic duress. But taking Ismert's allegations as true, I cannot agree that the plaintiff had an adequate legal remedy or failed to demonstrate that it had had "no real choice" or "no feasible alternative."

It is true, as the majority points out, that Ismert has not shown that renegotiation of its loan from NEL—which could not be obtained in the absence of a release—was necessary to avoid *bankruptcy*. Ismert could have rejected the release and any other agreement with NEL, refused to continue repaying the loan, and taken its chances when NEL sued. I do not view this form of self-help as an adequate remedy at law. Regardless of the possibility that Ismert could someday persuade a court that it had good defenses against NEL's suit, Ismert likely would have found its ability to do business severely hampered by the public knowledge that it had defaulted on a loan. Nor would the situation be different if Ismert stopped making payments and sued NEL before NEL sued it. NEL's counterclaim as a defendant would have the same effect as its complaint as a plaintiff.[8]

Withal, the majority calls attention to Ismert's failure promptly to commence suit, which it views as undermining Ismert's allegation that it lacked a real choice. Although Ismert's difficulties with NEL began in 1982, Ismert did not sign a purported release until July 1984. Ismert filed its complaint in this action in March 1985, approximately eight months later. I do not believe that the eight-month delay is sufficient to vitiate the duress claim as a matter of law. Concededly, a factfinder assessing the credibility of Ismert's duress

---

**8.** It should be noted that Ismert has continued to repay the loan, under the renegotiated terms, during the pendency of this litigation. While Ismert has neglected to point out that this approach is better for its business than defaulting on the loan would have been, I do not consider the omission serious. NEL never argued that Ismert's adequate remedy at law was a default on the loan. This is not to criticize the majority's rationale—which I find more nearly persuasive than NEL's attempts to distinguish *International Underwater*—but to explain why I am prepared to fill in the interstices of Ismert's argument. The interstices are present because Ismert responded to the arguments NEL actually made, rather than to the arguments NEL could or should have made.

theory might wish to consider how long Ismert waited to sue. But, without hearing live witnesses, I would not automatically penalize Ismert for failing to sue NEL as soon as the relationship began to deteriorate, or as soon as Ismert promised to release NEL, or as soon as Ismert obtained the loan renegotiation it required. Just as the majority argues that courts should encourage settlement of lawsuits, I would contend that we should not deter attempts to settle differences in advance of litigation. If the law were to supplement the statute of limitations with a blanket requirement that actions be commenced almost simultaneously with the onset of damages, the courts would recall today's heavy dockets with nostalgia.

While the majority indicates that Ismert's claim of duress is weaker than the claim advanced by plaintiff in *International Underwater*, in at least one significant respect Ismert's claim is stronger. In *International Underwater*, the plaintiff obtained $575,000 rather than the $775,000 it hoped to receive in an agreement with the defendant, or the $811,816.73 for which it sued. Although the settlement figure of $575,000 represents a substantial percentage of the total sought by plaintiff, and might simply reflect a discount for the risks of litigation, the court nevertheless permitted plaintiff's duress claim to go to trial. In contrast, Ismert gained renegotiation of a loan. While this benefit was considerable enough, in Ismert's view, to compel acceptance of NEL's terms, its value constitutes only a small percentage of Ismert's potential gain, should it sustain its damages claims.

In response to the majority's argument that Ismert is unlike the plaintiff in *International Underwater*—which did not learn of the defendant's wrongful conduct until it was too late to do anything about it—I note Ismert's allegation that it gave up sales relationships with non-NEL agents in Chicago, New York, Washington, D.C., Fort Lauderdale, and Miami in order to enter an exclusive arrangement with NEL. If it is true that NEL proceeded to disparage and discourage the marketing of Is-

mert's service, Ismert was trapped no less than the plaintiff in *International Underwater*.

The majority reads the doctrine of economic duress narrowly because, among other things, it fears attempts by plaintiffs to set aside settlements and go to trial with a "heads I win, tails you lose" mentality. The likelihood that this attitude will motivate plaintiffs would seem greatest in the *International Underwater* context, where the plaintiff got most of what it sought and attempted to fill in the remainder with a risk-free trial. Here, where Ismert got only a small fraction of what it sought, I see somewhat less danger that the courts will be used for cynical and improper purposes. One element of the duress claim is a disproportionate exchange of values. The more disproportionate the exchange, the less likely the claim is frivolous. Additionally, it goes without saying that the traditional deterrent to frivolous lawsuits—fear of defeat and the consequent waste of time and money—has been augmented by recent judicial willingness to impose substantial sanctions. *See* 28 U.S.C. § 1927 (1982); Fed.R.Civ.P. 11; *see generally, e.g., Thornton v. Wahl*, 787 F.2d 1151 (7th Cir. 1986); *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir. 1985). Thus, while I can appreciate the majority's concern that the doctrine of economic duress not be available as a device for the wholesale avoidance of settlements, I believe that *International Underwater*, which uses broad and unqualified language in stating the elements of a duress claim, demonstrates a willingness by the Massachusetts courts to construe the doctrine more expansively than does the majority.

### D. *Affirmance*

Finally, the district court held, and NEL argues, that even if Ismert was subject to duress, it affirmed the purported release by accepting benefits thereunder, and so cannot now avoid it. If a contract is entered into as a result of duress, the contract is "not void but voidable and could be ratified by conduct after the restraint was

removed." *Rosenbloom v. Kaplan,* 273 Mass. 411, 417, 173 N.E. 522, 524 (1930).

Of course, there can be no affirmance unless the duress has ended.[9] *See Ford v. Cahill,* 315 Mass. 492, 495, 53 N.E.2d 81, 83 (1944) (threats made to secure plaintiffs' enrollment in retirement fund had "spent their force" long before complaint was filed); *Rosenbloom v. Kaplan,* 273 Mass. at 417, 173 N.E. at 524 (no evidence that plaintiff, when making payments on note, was not free from any coercion or illegal influence theretofore put upon him); *Webb v. Lothrop,* 224 Mass. 103, 105, 112 N.E. 934, 935 (1916) (plaintiff affirmed contract by making monthly payments when free from all undue influence); Restatement (Second) of Contracts § 380(1) (1981) (power to avoid contract for duress is lost if, after circumstances making contract voidable cease to exist, party manifests intention to affirm or acts in manner inconsistent with disaffirmance).

Here, Ismert alleges that the duress has not ended. According to Ismert, it remains incapable of repaying the NEL loan on the original terms because of the damage NEL did to Ismert's business. Since I perceive a genuine issue of material fact as to whether economic duress was present and, if so, whether it continues, I cannot agree as a matter of law that any agreement by Ismert to a release was untainted by duress, or that Ismert has affirmed such a release.

Inasmuch as I believe that Ismert has made out a valid claim of duress, I would reverse in part the district court's grant of summary judgment and remand the action for trial, with the proviso that the existence of a release is the law of the case. I would permit Ismert to attempt to show that the release should be voided for duress and, if it succeeds on that issue, to show that it is entitled to damages. Accordingly, I respectfully dissent from the majority's disposition of Ismert's duress claim.

**9.** The district court applied the proper legal test when it stated that "Ismert cannot avoid a contract for duress, *if after the duress ends,* it manifests to the other party its intention to af-

## VI. *Conclusion*

Because this panel unanimously agrees that the district court was correct in all respects other than duress, and because a majority of the panel concludes that the court was also correct in respect to duress, the judgment of the district court is

*Affirmed.*

BREYER, Circuit Judge, joined by COFFIN, Circuit Judge, writing separately in respect to Part V.

Ismert claims that its settlement agreement is invalid because it signed that agreement under duress. In our view, however, no reasonable factfinder could decide the duress question in Ismert's favor. Hence, the district court properly granted NEL summary judgment.

The Supreme Judicial Court of Massachusetts has defined "duress" in the settlement context to mean "such fear as precludes" the settling party "from exercising free will and judgment." *Coveney v. President of College of Holy Cross,* 388 Mass. 16, 22, 445 N.E.2d 136, 140 (1983) (release waiving claims against college, signed by student fearful of not graduating, held not to be the product of duress). The Massachusetts Appeals Court elaborated on the concept of duress in *International Underwater Contractors, Inc. v. New England Telephone & Telegraph Co.,* 8 Mass.App. 340, 393 N.E.2d 968 (1979), describing the test for 'economic duress' in two ways. Citing Williston, the court wrote:

> a party must show that he has been the victim of a wrongful or unlawful act or threat.... [S]uch act or threat must be one which deprives the victim of his unfettered will, ... [and, as a result,] the party threatened must be compelled to make a disproportionate exchange of values.

*Id.* at 970 (quoting 13 W. Jaeger, *Williston on Contracts* § 1617, at 704 (3d ed. 1970)).

firm...." Slip op. at 8 (emphasis added) (citing Restatement (Second) of Contracts § 380(1) (1981)).

The court also described the elements of duress in the following terms:

> (1) That one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party.

393 N.E.2d at 970 (citing *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 301, 62 S.Ct. 581, 588, 86 L.Ed. 855 (1942)). As these statements of doctrine make clear, an act may be "unfree" not only when compelled by an outside force (as in Aristotle's example where the wind carries a man away), or when taken in ignorance (as when the actor is blind drunk), but also when the actor lacks any real choice or alternative ("your money or your life"). To prevail here, Ismert must show this last mentioned possibility, that NEL wrongfully put it in a position that left Ismert with no real choice. That is to say, NEL's wrongful acts must have allowed Ismert no alternative but to succumb to a "disproportionate exchange of values."

█ Ismert has not made the necessary showing. Its argument involves five propositions: (1) Ismert had a valid, valuable claim against NEL; (2) at the time of settlement, Ismert's financial position was precarious; (3) NEL's wrongful acts caused these financial difficulties; (4) NEL's settlement offer—partly to forgive, and partly to extend, Ismert's secured debt—was disproportionate to the value of Ismert's basic claim; and (5) Ismert had to accept NEL's settlement offer as the only alternative to bankruptcy. However debatable the first four of these propositions may be, Ismert cannot demonstrate the last of them; it has not presented evidence that accepting NEL's offer was the only feasible alternative to bankruptcy.

Ismert's claim that it had no alternative rests upon its assertion that, in the absence of settlement, NEL would have demanded that Ismert repay its loan on schedule, and that this demand would have forced Ismert into bankruptcy. Yet, this assertion overlooks the fact that, in order to enforce its demand over Ismert's objection, NEL would have had to bring a legal action— and Ismert could then have raised its claims against NEL in defense. Alternatively, Ismert might have refused to sign a release and brought its own action against NEL—leaving NEL to counterclaim for repayment of the loan. In either event, whether or not a court would then have stayed NEL's efforts to collect the loan proceeds would have depended on its preliminary assessment of the relative merits of the parties' claims. If that assessment led it to allow NEL to collect on the debt, one could not easily say that wrongful acts by NEL had forced Ismert into bankruptcy or that Ismert's legal remedy (as opposed to its substantive claim) was inadequate. Courts have consistently held that the presence of an adequate legal remedy undermines claims of economic duress. *See International Halliwell Mines, Ltd. v. Continental Copper & Steel Industries, Inc.*, 544 F.2d 105, 108 (2d Cir.1976); *Borbely v. Nationwide Mutual Insurance Co.*, 547 F.Supp. 959, 979 (D.N.J.1981); *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 644 (S.D.N.Y. 1978), *aff'd*, 597 F.2d 314, 323 (2d Cir.1979); *Willett v. Herrick*, 258 Mass. 585, 603, 155 N.E. 589, *cert. denied*, 275 U.S. 545, 48 S.Ct. 83, 72 L.Ed. 417 (1927); *see also* 13 W. Jaeger, *Williston on Contracts* § 1617, at 704, 705 n. 11 (3d ed. 1970).

In addition, allegations in Fred Ismert's own affidavit suggest that long before the parties began negotiating over a release, Ismert knew of NEL's alleged wrongful acts and had the opportunity to seek redress in court. NEL terminated one-third of its general agents in the summer of 1982. That fall, Ismert had "numerous conversations" with NEL and threatened to bring suit for breach of contract. In July 1983 Ismert told NEL that NEL's breach of contract was forcing Ismert out of business. But negotiations over a release did not begin until September 1983, and Ismert did not sign a release form until July 1984. Having alleged these facts, Ismert has not gone on to show why it could not have averted its July 1984 predicament by suing

NEL, as in fact it threatened to do. Ismert chose to wait rather than to sue; and that choice, at least in part, contributed to Ismert's later predicament. Thus, Ismert's own affidavit fails to sustain the argument that NEL's acts prevented Ismert from having any real choice. *Cf. International Halliwell*, 544 F.2d at 108 (the burden of avoiding a contractual obligation on the ground of duress "necessarily increases proportionately with the delay in initiating suit"; "a party asserting [duress] must do so promptly"); *Anselmo v. Manufacturers Life Insurance Co.*, 771 F.2d 417, 420 (8th Cir.1985) (although he faced "a difficult dilemma," plaintiff was not "bereft of his free will" where he "took ample time and precautions before signing" an allegedly coerced release).

Ismert's claim differs in these respects from the claim at issue in *International Underwater, supra,* the case on which Ismert chiefly relies. In that case, the plaintiff's evidence indicated that the defendant had told the plaintiff to perform additional work on a contract and had promised to pay the cost of the extra work. After the plaintiff performed, the defendant refused to pay. When the plaintiff sued, the defendant relied on a settlement under which the plaintiff had released its claims in exchange for $575,000. The Massachusetts Appeals Court held that the plaintiff should have been allowed to reach the jury on its argument that the settlement was voidable because of duress. It stressed the plaintiff's evidence that the defendant had induced the plaintiff to do the extra work, that the defendant's own negotiators agreed with the plaintiff that the work was worth $775,000 (although the defendant's board of directors refused to settle at that figure), and that the plaintiff's financial circumstances after completing the work were so precarious that bringing suit was not a feasible alternative at the time; plaintiff was so desperate for cash that it had no choice but to settle.

In *International Underwater*, the plaintiff did not learn about the defendant's wrongful conduct (its refusal to pay) until it had already gone to the expense of com-

pleting the work. Ismert, however, might have sued NEL for breach of contract before reaching the state where it felt compelled to accept the settlement offer. Furthermore, once the plaintiff in *International Underwater* learned of the defendant's misconduct, its only alternative to accepting a settlement was to sue, and doing so was not feasible because "recourse to the courts of law" would not have been "quick enough to save the victim's business or property interests." 393 N.E.2d at 972. Here, by contrast, Ismert had the entirely feasible option of doing nothing and awaiting suit by NEL. There are other differences between the two cases as well. For one, we can find no counterpart here to the negotiators in *International Underwater* who allegedly agreed with the plaintiff's valuation of its claim. But we need not explore these other differences, since the ones we have mentioned are sufficient.

We recognize that the preceding analysis interprets the notions of 'no real choice' and 'no feasible alternative' quite strictly. But, we believe that such a strict interpretation is what the Massachusetts courts intend—particularly in this commercial context where two businesses have dealt at arm's length through counsel. Extending the doctrine of economic duress beyond the existing case law would threaten to undercut the well-established policy favoring the private settlement of disputes. *See, e.g., Cities Service Oil Co. v. Coleman Oil Co.,* 470 F.2d 925, 929 (1st Cir.1972) ("There is an obvious public policy favoring the amicable settlement of litigation, and agreements accomplishing this result will be disregarded for only the strongest of reasons."), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973). Consider, for example, a prospective plaintiff who has settled a substantive claim for a moderate amount of money. He might reason that, if a jury would attach a significantly higher value to his substantive claim, it might also be receptive to the argument that the settlement embodied a "disproportionate exchange of values" forced upon him through economic coercion. Since an unfavorable

jury verdict (on either the substantive claim or the duress argument) would still leave him with his settlement, the would-be plaintiff may well think, 'Heads I win, tails you lose.' And potential defendants, fearful of this thinking, might hesitate to settle. This scenario, of course, does not argue for rejecting 'economic duress' arguments wholesale. But it does argue for a fairly strict reading of the notion of 'no real choice'—the sort of reading the Supreme Judicial Court gave the term in *Coveney, supra.*

In any event, we have no reason to believe that the Massachusetts courts would extend the scope of 'economic duress' to include the facts at issue here. And, for these reasons, we conclude that the district court properly granted NEL's motion for summary judgment on the question of duress.