Cratsley, J.
In this action, ITT Commercial Finance Corp. (“ITT”) seeks to confirm an arbitration award. As a result of a summary judgment decision of Judge Saris, a trial was ordered on one affirmative defense to confirmation asserted by the defendants. In November of 1993, this Court held a juiy-waived trial on the affirmative defense of the defendants, John C. Tyler and Barbara D. Tyler. They claim that the arbitration agreement is invalid because their signatures were procured through economic duress and because the agreement was not supported by consideration. Based on the testimony, exhibits, and reasonable inferences drawn therefrom, this Court makes the following findings of fact, rulings of law, and order for judgment.
FINDINGS OF FACT
John C. Tyler (“Tyler”) is the president and sole stockholder of Sunshine Home Entertainment Centers, Inc. (“Sunshine"). Barbara D. Tyler is married to John Tyler. Barbara Tyler has never been an officer, employee or stockholder of Sunshine.
Sunshine sells, rents and leases appliances, consumer electronics and furniture. During the relevant time period, Sunshine was a franchisee of Curtis-Mathes, Inc.
On November 25, 1986 Sunshine executed a financing agreement with ITT to finance Sunshine’s purchase of Curtis-Mathes inventory (“original financing agreement”).[1] (Ex. B.)[2] Pursuant to the terms of the financing agreement, ITT agreed to extend credit to Sunshine in such amounts and at such times as ITT, in its sole discretion, deemed appropriate. The agreement provided as follows:
1. You may in your sole discretion decide the amount of credit you extend to us, and which items of inventory and/or equipment we may sell, rent and/or lease to third parties. You may combine all of your advances to make one debt owed by us.
2. You may in your sole discretion decide the amount of funds, if any, you will advance on any inventory and equipment we may seek to acquire and the length and price of any rental contract and/or lease agreement pertaining to such inventory and equipment which we enter into with any third party or parties. We agree that any decision to advance funds on any inventory and equipment shall not be binding on you until such time as the funds are actually advanced.[3]
In the event that Sunshine failed to comply with any of the terms of the agreement, the agreement provided:
17(a). [ITT] may call all or any part of the amount [Sunshine] owe[s] [ITT]. . . due and payable immediately . . . together with court costs and all costs and expenses of [ITT’s] repossession and collection activity, including, but not limited to attorney’s fees of 15% of the total indebtedness or the amount legally permitted (whichever is greater).
Also pursuant to the terms of the agreement, both parties had the right to terminate the agreement at any time, for any reason, and to accelerate all debt immediately, as follows:
24. [This agreement] shall be in force until one of us gives notice to the other that it is terminated. Upon termination, all of [Sunshine’s] obligations to *431 [ITT] shall be immediately due and payable, even if they are not yet due under their terms.
On or about April 15, 1987, John Tyler and Barbara Tyler executed a personal guaranty, whereby the Tyl-ers agreed that:
If [Sunshine] fails to pay any liability to [ITT] when due, all liabilities to [ITT] shall be deemed to have become immediately due and payable, and the [Tylers] shall then pay upon demand the full amount of the principal charges remaining unpaid thereunder and interest on the principal charges . . . together with all expenses, including reasonable attorney’s fees, which shall be deemed to be not less than 15% of the debt or the amount legally permitted if placed with an attorney for collection.
The liability of the [Tylers] is direct and unconditional . . . [ITT] need not exhaust its rights of recourse against [Sunshine] or any other person or any security [ITT] may have... before being entitled to payment from the [Tylers]. This Guaranty shall survive any bankruptcy and insolvency proceedings brought by or against [Sunshine].
(Ex. E).
From 1985 through 1989 ITT extended a conditional line of credit to Sunshine for the purpose of financing Curtis-Mathes inventory. The financing was secured by the financing agreement and by the personal guaranty.
For at least part of 1989 Sunshine consistently failed to pay ITT in accordance with the terms of the financing plan. In June of 1989, despite Sunshine’s default history, ITT and Sunshine entered into negotiations for a revised financing agreement in which ITT would increase Sunshine’s credit line (“revised financing agreement”). ITT agreed to increase Sunshine’s credit line contingent upon certain conditions, one of which required the Tylers to grant to ITT a mortgage on property located on East Main Street in Norton, Massachusetts. (Ex. F.)
Extensive negotiations concerning the terms of the revised credit agreement were conducted between ITT’s counsel, Gordon Shultz (“Shultz”), and the Tylers’ counsel, F. Bradford Townley (“Townley”). During this time Sunshine again defaulted under the terms of the existing financing agreement. (Ex. G.) Notwithstanding this default, Shultz and Townley continued negotiations for the extension of further credit.
By letter dated August 16, 1989 Shultz sent to Townley a revised financing agreement which had been approved by ITT. (Ex. 8.) This agreement was unacceptable to Tyler due to references to Sunshine being “in default.” Further negotiations continued between Shultz and Townley on the issue of the elimination of those references from the revised agreement.
In October of 1989, during these negotiations, ITT requested that the Tylers furnish ITT with a mortgage to secure the existing credit line and the outstanding debt. (Exs. H & 11.) Tyler responded by letter dated October 5, 1989, offering to furnish ITT with a second mortgage on commercial property located at 1124 Washington Street in South Attleboro, Massachusetts.[4] In that letter Tyler made it clear that he offered the mortgage as a term of the revised credit agreement and not to secure his existing credit line. (Exs. I & 12.) ITT did not specifically respond to this contention.
On October 19, 1989 John Tyler and Barbara Tyler executed a mortgage on the South Attleboro property. (Ex. 14.) Tyler did not record the mortgage on that date because the terms of the revised financing agreement had not yet been finalized. Instead, Tyler gave the executed mortgage to Townley to hold until an agreement had been finalized. Tyler recorded the mortgage at the Registry of Deeds on October 26, 1989 around which time he believed that a final agreement for the increase in credit had been reached. (Tyler's trial testimony.) Tyler’s attorney shared this belief in a completed agreement and testified he felt the agreement was reached between October 19 and October 26. (Townley’s trial testimony.)
Further negotiations concerning the omission of any reference to Sunshine’s “past due indebtedness” from the agreement, however, continued. (Exs. 15, 16, 17, 17A, 18.) On December 4, 1989, Townley forwarded a revised agreement dated November 13,1989 to Shultz, which was signed by John Tyler and Barbara Tyler (“November 13 revised agreement"). (Exs. J & 20 and also marked 19.) Along with the signed agreement, Townley included a copy of the executed mortgage. ITT never executed this revised agreement.
In November of 1989 ITT sent a form letter to Sunshine requesting that Tyler sign an agreement to arbitrate disputes (“arbitration agreement”). (Ex. 23.) ITT sent this letter to all ITT borrowers who were Curtis-Mathes franchisees. The arbitration agreement was first presented to Tyler in December of 1989 by an ITT “floor checker,” Kris Satkunas (“Satkunas”). Tyler signed the arbitration agreement, but did not fill out the top portion of the form.
Tyler subsequently forwarded the arbitration agreement to Townley for his review. Townley witnessed Tyler’s signature and returned the document to Tyler by letter dated December 13, 1989. In that letter, Townley stated his belief that “this is a contract forced upon [Tyler] under duress, or under threat of termination of commercial relationship . . .” (Ex. 24.) Tyler then forwarded the uncompleted arbitration agreement to ITT. (Ex. M.)
After the extensive and new negotiations concerning the revised financing agreement, ITT proposed by letter dated January 9, 1990, to extend Sunshine further credit only if Sunshine complied with the new and different terms and conditions set forth in this letter. (Exs. K & 25.) Tyler, fearing that ITT had now decided to give him no new credit thus closing his *432 business, responded to ITT by letter dated January 11, 1990, stating:
I am getting the feeling that ITT is not pleased with the relationship that we have built up... If, in fact, ITT wishes to end that business relationship in the near future, I would like to know now as I believe that I can assist in that effort. However, I will do my best to phase ITT out of my business relationship over the next 6 months to one year but I will not at gunpoint waive any and all rights that I presently enjoy. (Ex. 26.)
On February 5, 1990 Townley sent a letter to Shultz expressing his disappointment that the prior negotiations between the parties seemed to have been fruitless. Townley informed Shultz that the Tylers would not sign the January 9 proposed agreement. (Ex. 27.)
While the negotiations for a new financing agreement proceeded, ITT continued to extend credit to Sunshine, including periods in which Sunshine was in default. Tyler placed an order for Curtis-Mathes products on January 9, 1990, which was shipped to Sunshine on January 30. ITT approved Tyler’s request for credit to cover that order. After the January 9 order, however, ITT financed no further orders by Sunshine.[5]
On or about March 23, 1990, during the period in which ITT declined to extend credit to Sunshine, Satkunas visited Tyler at his store and presented Tyler with another arbitration agreement to be filled out and signed. Satkunas told Tyler that unless he signed the agreement, Sunshine would receive no more inventory. On that date, Tyler completed and signed the arbitration agreement (“March 23 arbitration agreement"). Tyler then went to his home where Barbara Tyler signed the agreement. (Exs. N & O.) The agreement was witnessed by the Tylers’ daughter, Shannon Tyler, and returned to ITT.
At some point in April 1990, after the Tylers signed the March 23 arbitration agreement, Tyler placed an order for Curtis-Mathes inventory. ITT agreed to finance that order.
In September of 1990 Sunshine again defaulted on its payments to ITT. (Ex. Q.) By letter dated September 26, 1990 ITT demanded payment of the entire amount of Sunshine’s indebtedness which totalled $651,367.89. (Ex. R.) Thereafter, Sunshine filed for bankruptcy protection. ITT then demanded payment from the Tylers pursuant to their personal guaranty. The Tylers refused payment. On February 21, 1991, pursuant to the March 23 arbitration agreement, ITT filed for arbitration naming the Tylers as respondents. An arbitration hearing was held in September of 1991 before Arbitrator Michales. On October 30, 1991 Arbitrator Michales entered an award in favor of ITT in the amount of $497,292.25 “as and for unpaid principal and interest through August 31, 1991 plus interest from and after August 31, 1991 at the contractual rate of interest; and $74,500 as and for reasonable attorney’s fees, costs, expenses consistent with the agreement and $5,354.12 representing ITTs filing fees.” On November 8, 1991 ITT filed this action to confirm the arbitration award.
RULINGS OF LAW
G.L.c. 251, §1 provides that “[a] written agreement to submit any existing controversy to arbitration . . . shall be valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.” The court, however, must adjudicate issues relating to the making of an agreement to arbitrate. Quirk v. Data Terminal Systems, Inc., 379 Mass. 762, 767 (1980) (claim of fraud in the inducement of the arbitration clause itself must be adjudicated by the court).
A document signed under economic duress is not binding. See International Underwater Contractors, Inc. v. New England Telephone and Telegraph Co., 8 Mass.App.Ct. 340, 342 (1979).[6] In International Underwater the Appeals Court set forth the test for economic duress as follows:
To show economic duress (1) a party “must show that he [or she] has been the victim of a wrongful or unlawful act or threat, and (2) such act or threat must be one which deprives the victim of his [or her] unfettered will.” “As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values.”
The elements of economic duress have also been described as follows: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party (citations omitted).
The mere taking advantage of financial difficulty is not duress, unless the party taking advantage contributed to or caused that financial difficulty. Id. at 342.
To prevail on a claim of economic duress, the wrongful act must have allowed the plaintiff no alternative course of action or redress other than to succumb to a disproportionate exchange of values. Delaney v. Chief of Police of Wareham, 27 Mass.App.Ct. 398, 406 (1989). Moreover, absent compelling circumstances, the availability of an adequate legal remedy undermines a claim of economic duress. Id. at 407; Ismert and Assocs., Inc. v. New England Mutual Life Ins. Co., 801 F.2d 536, 549 (1st Cir. 1986).
This Court finds that the elements of economic duress exist in this case. The evidence indicates that the progression of events that transpired between the parties ultimately resulted in the Tylers signing the arbitration agreement under economic duress.
The circumstances of economic duress originated in June of 1989. It is undisputed that at that time the parties entered into negotiations to revise the original financing agreement to support an increase in credit to Sunshine. The negotiations continued from June of 1989 through December of 1989. The extensive corre *433 spondence between Townley, on behalf of Tyler, and Shultz, on behalf of ITT, during that period suggests that the parties had reached an agreement as to the material terms of the revised . . . financing agreement at some point in early November. See Exs. 16, 17, and 17A.
In anticipation of that agreement, Tyler executed a mortgage on the 1124 Washington Street properly on October 19, 1989. Tyler waited until October 26 to record the mortgage, at which time Tyler (as well as Townley) believed that the parties had agreed to the terms of the revised financing agreement. Tyler’s belief that the agreement was final was reasonable given the correspondence between Shultz and Townley. This Court finds that Tyler executed and recorded the mortgage as a required condition of the revised financing agreement, and that he would not have done so had he known that ITT did not intend to agree to the negotiated terms.
The proposed financing agreement sent by ITT to Tyler on January 9, 1990 disregarded the prior negotiations between Shultz and Townley. It also led Tyler to believe that his credit arrangements with ITT were ended. By that date the Tylers had recorded the mortgage on the 1124 Washington Street property, thereby increasing their financial exposure. The Court finds that ITT, through its agents and employees, confused and misled Tyler by refusing to execute the November 13 revised agreement which was forwarded to them by their attorney, Townley. Therefore, ITT’s misleading act contributed to the Tylers’ financial difficulties. See International Underwater, supra at 342. The Court considers this action by NT one in a series which resulted in the Tylers’ signing the arbitration agreement under duress.
The January 9 letter states that ITT would reinstate its financing only if Sunshine fulfilled the enumerated terms and conditions. Although ITT approved financing for an order of Curtis-Mathes products which Tyler placed on January 9, this Court finds that no further orders were approved until after the March 23 arbitration agreement was executed. This Court accepts Tyler’s state-of-mind testimony that during that period inventory in the store was low and that he believed that ITT would not extend him credit for new goods unless he signed the arbitration agreement. NT’s “Collection Contact Record” confirms this state of affairs, but offers different explanations for their refusal to ship goods. Ex. P, p. 8. This lack of financing, therefore, also contributed to the Tylers’ financially vulnerable position.[7]
This Court further finds that by the time the floor checker brought the arbitration agreement to Tyler on March 23, 1990, Tyler believed that he had no alternative to avoid the failure of his business and his own personal liability under the personal guaranty, but to sign the agreement. By that date, ITT had suspended financing, inventory in the store was low, and Tyler feared that Sunshine would not survive. In addition, Tyler believed that he could not seek alternative financing because he had already mortgaged his commercial building to ITT. Therefore, when the floor checker told Tyler to sign the arbitration agreement, Tyler took seriously the threat that ITT would furnish no more financing and thus no inventory.[8] As a direct result of that threat, Tyler and his wife filled out and signed the arbitration agreement.[9] Accordingly, these threats produced fear which precluded the Tylers from exercising freewill and judgment. Coveney v. President and Trustees of the College of Holy Cross, 388 Mass. 16, 22 (1983).
The totality of circumstances prior to March 23, 1990 support Tyler’s belief that he had no alternative but to sign the arbitration agreement. As previously stated, Tyler believed that he could not seek financing from other lenders because his commercial property was already mortgaged to ITT. In addition, at that time Tyler was receiving no financing and/or inventory from ITT. Therefore, Tyler felt pressure to succumb to NT’s demands in the expectation of receiving additional financing for his inventory so that Sunshine could meet its payments to ITT in accordance with the original financing agreement.
In addition, the availability of an adequate legal remedy is questionable. See Ismert, supra at 549 (presence of an adequate legal remedy undermines claims of economic duress). ITT argues that Tyler could have refused to sign the arbitration agreement, brought suit against NT to rescind the mortgage, or sought alternative financing.[10]
By March 23, 1990, Tyler was in a financially vulnerable position; a situation to which ITT had contributed. He was receiving no credit and no inventory from ITT and the original credit agreement allowed ITT to accelerate the entire debt upon default. Given the fact that Tyler had little inventory to sell, NTs potential moves against him were a significant threat. Therefore, Tyler was not in a position in which he could refuse to sign the arbitration agreement, go to court, and continue to do business without financing.[11] See International Underwater, supra at 346 (“if recourse to courts of law is not quick enough to save the victim’s business . . . , there is no adequate legal remedy”). Accordingly, Tyler could not have reasonably commenced a civil action against ITT as an alternative to signing the arbitration agreement. This finding is confirmed by the fact that Sunshine was, in fact, ultimately forced into bankruptcy after ITT accelerated the debt. It was, therefore, reasonable for Tyler to believe that the same would have occurred if Tyler had sought legal redress against ITT at an earlier date.
ORDER FOR JUDGMENT
For the foregoing reasons, this Court ORDERS that JUDGMENT to enter for the defendant on the grounds that the arbitration agreement was signed under eco *434 nomic duress. Therefore, confirmation of the arbitrator’s award is DENIED.

 The November 25, 1986 agreement replaced an earlier agreement, dated August 28, 1985, between ITT and Tyler TV of Attleboro, Inc., which was the predecessor to Sunshine. The difference in name was the only difference between the two agreements.

 Plaintiffs exhibits are indicated by letters. Defendant’s exhibits are indicated by numbers.

 The term “you" as used in this agreement refers to ITT. The term “us” or “we” refers to Sunshine.

 ITT had previously agreed to accept a mortgage on the South Attleboro property instead of a mortgage on the East Main Street property. The South Attleboro property is the location of Sunshine’s principal place of business.

 While there is some debate as to whether ITT refused to finance new orders by Tyler after January 30, 1990 or Tyler told ITT he had no need for new merchandise, the final entry on page 8 of Ex. P, “Collection Contact Record,” is dispositive. “3/30: No orders were approved for Sunshine for the month of March. The last shipment was on 1/30/90."

 ITT argues that, under the Federal Arbitration Act, 9 U.S.C., §10, which applies to this proceeding, economic duress is not a ground upon which an arbitration agreement may be vacated. 9 U.S.C., §2, however, states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” In Rodriguez de Quijas u. Shearson/American Express, Inc., 490 U.S. 477, 483-84 (1989), the Supreme Court stated:
The language quoted above from §2 of the Arbitration Act also allows the courts to give relief where the party opposing arbitration presents “well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds ‘for the revocation of any contract.’ ” (Citations omitted.)
Accordingly, economic duress is a ground upon which this Court may vacate an arbitration award.

 Defendant argues that, pursuant to the existing financing agreement, ITT had the right to refuse financing at any time. The Court finds, however, that given the totality of circumstances ITT’s acts “created the financial difficulties of the plaintiff, which it then took advantage of." International Underwater, supra at 346. Therefore, although ITT had a legal right to withhold financing, its actions went beyond that to create a situation of economic duress. This is particularly true when the financing of new inventory had been a routine procedure for Tyler.

 ITT provided no evidence during the trial that the floor checker did not, in fact, make this threat. Therefore, the Court finds that the threat was made given the generally credible testimony of Mr. and Mrs. Tyler.

 These findings also apply to Barbara Tyler.

 As discussed, Tyler did not believe that seeking alternative financing was a feasible alternative given the fact that his commercial property was already mortgaged.

 For the same reason, a suit against ITT to rescind the mortgage on the 1124 Washington Street property would not have been reasonable. Sunshine could not continue doing business without financing.