Fabricant, J.
INTRODUCTION
These four actions[1] arise from the December, 1997, termination of Steven Nygren from the position of Managing Director of American Management Services, Inc. (“AMS”). That termination triggered the filing in December of 1997 of three suits: the first (Middlesex No. 97-6507) by AMS and its principal, George Clout-ier, against Nygren, asserting various claims of misfeasance by Nygren against the corporation; the second (Essex No. 97-2509) by Nygren against AMS and Cloutier, asserting wrongful discharge and related claims; and the third (Middlesex No. 97-6663) by Cloutier against Nygren, seeking payment on a note by Nygren to Cloutier.
On August 14, 1998, the parties, along with Nygren’s new company, Atlantic Management Services, Inc. (Atlantic), entered into an agreement to settle all three cases. Between that date and October 9, 1998, the parties implemented most, but not all, of the provisions of the settlement agreement. Thereafter, however, Nygren and Atlantic refused to perform further under the settlement agreement. AMS and Clout-ier then amended their complaint to claim enforcement of the settlement agreement, and Nygren and Atlantic filed the fourth action, No. 99-2638, seeking to void the settlement agreement and asserting additional claims. Presently before the Court are AMS and Cloutier’s motions for partial summary judgment. For reasons that will be explained, the motions will be allowed.
BACKGROUND
The materials submitted in connection with the present motions, viewed in the light most favorable to Nygren, present the following facts. AMS is a management consulting firm. George Cloutier is its president, chief executive officer, and majority shareholder. Nygren began working at AMS following his graduation from college in 1991, left in 1992, and returned in 1993. At that time, Nygren signed a Non-Competition Agreement that precluded him from competing directly or indirectly with the business of AMS, in specified geographic areas, for two years after the termination of his employment. Thereafter, AMS provided Nygren with compensation at increasing levels, eventually reaching an annual level of $600,000, as well as a line of credit with the company beginning in 1996.
By 1997, Nygren had risen to the position of Managing Director, responsible for AMS’s survey and consulting departments. On February 14, 1997, Nygren and AMS entered into a written agreement regarding Nygren’s employment. Under that agreemc nt, Nygren would receive stock in the company reflecting a fifteen percent ownership interest, subject to restrictions on transfer, and subject to repurchase by the company, on specified terms, upon the termination of Nygren’s employment. The agreement further provided that Nygren would receive a $100,000 bonus for 1996, as well as a loan of $100,000, tobe used for the purchase of a house, and to be secured by a second mortgage on the house; the loan would be forgiven if the company achieved “net collections” in a specified amount for 1997. Nygren’s compensation for the remainder of 1997 and thereafter was set as a percentage of the company’s net billings, with specified bonuses if the company achieved certain sales increases. The agreement further provided that Nygren reaffirmed his earlier noncompetition agreement, and that his termination, unless for cause, would occur only after six months notice. Finally, the agreement provided that the company “will terminate our previous line of credit arrangement,” and that Nygren would repay the outstanding amount by monthly installments.
The stock provided for in the agreement was issued to Nygren in May of 1997, pursuant to an executed Stock Restriction and Repurchase Agreement. Nygren also received the $100,000 loan, but did not use it for a home purchase. In a written agreement dated August 14,1997, Nygren and the company acknowledged that the funds had been used for other purposes, and agreed to certain changes in the terms of the loan. On the same date, Nygren executed a note to Cloutier personally, in the amount of $47,000, for amounts lent to him, secured by a second mortgage on a home he purchased at that time. Nygren agreed that his debts both to the company and to Cloutier personally would become payable in full immediately upon termination of his employment. As of the date of Nygren’s termination, $39,000 remained outstanding on his line of credit with AMS.
According to Nygren’s affidavit, during the period of his employment with AMS, he “incurred substantial gambling debts.”[2] His gambling caused him financial difficulty, despite the high level of his compensation from AMS. Additional financial difficulty arose, according to Nygren’s affidavit, from accumulated tax liability resulting from the company’s classification of Nygren as an independent contractor and failure to pay withholding taxes for him. Notably absent from Nygren’s affidavit is any suggestion that he was unaware of his treatment as an independent contractor responsible for his own taxes, or that any conduct of Cloutier or the company prevented him from paying quarterly estimated taxes, or from setting aside funds for his tax liability.
Nygren’s affidavit also asserts that the level of sales set in his employment agreement for forgiveness of his loan was “easily attainable,” but that Cloutier failed to generate projected sales “as a result of his lack of effort due to involvements outside of AMS.” Nygren does not assert, and no evidence indicates, that the company actually did attain that sales level.
On December 14, 1997, Cloutier terminated Nygren’s employment with AMS. The circumstances *496 leading up to that action are the subject of substantial dispute between the parties, with conflicting evidence offered in affidavits of Nygren and Cloutier, each supported at least in part by documents attached. Cloutier’s position, in substance, is that he discharged Nygren for cause, based on his discovery of substantial malfeasance by Nygren, including neglect of client accounts, misuse of company funds, fraudulent charges to clients, incurring unauthorized expenses to the company, and use of both a company credit card and Cloutier’s own credit card for substantial personal expenses. Nygren, in contrast, denies any misfeasance, and attributes his discharge to an effort by Cloutier to avoid responding to demands Nygren had made for information about the company’s finances, particularly with respect to “cash disbursements of large amounts made by AMS to Cloutier" and “Cloutier’s use of AMS funds for a private organization in which Cloutier was involved.” Nygren admits to failing to perform certain functions for a period of time during the spring and summer of 1997, but attributes that failure to an injury and resulting surgery.
As noted supra, Nygren’s termination triggered three lawsuits. On December 19, 1997, AMS and Cloutier filed Middlesex No. 97-6507 against Nygren, asserting a variety of claims for damages based on Nygren’s alleged misfeasance. Cloutier’s affidavit values the damages asserted at approximately $500,000. On December 23, 1997, after the filing but before service of the first suit against him, Nygren filed Essex No. 97-2509 against AMS and Cloutier, asserting wrongful discharge and related claims. On December 31, 1997, Cloutier filed Middlesex No. 97-6663, seeking to collect on his promissory note.
By May of 1998, Nygren and his wife had founded Atlantic as a management consulting firm. Cloutier’s affidavit asserts that Atlantic competes directly with AMS. Nygren does not contest that assertion, but contends that Atlantic’s services “are superior in quality and distinguishable from those provided by AMS.”
The parties then proceeded to negotiate a settlement of all claims raised in the three actions. All parties were represented by counsel in the negotiations, Nygren by his present counsel. In support of his position on the present motions, Nygren has submitted a copy of a letter from his attorney to him, dated July 21, 1998, commenting on a draft settlement agreement. The letter explains in detail the implications of the various provisions of the proposed settlement, and warns Nygren emphatically of the potential consequences of entering into the agreement and then failing to comply with its terms in any of various ways. Counsel urges Nygren not to sign the agreement “if you harbor any notions about engaging in any of the above or in any activities contrary to the Agreement,” and further urges him, with respect to various particular provisions, to “make sure you can live [with] it before you sign,” and to “[m]ake sure you can handle this before you sign.”
The settlement agreement, executed by all parties as a sealed instrument, recites the existence of the pending litigation, as well as of a dispute between the parties regarding Nygren’s noncompetition agreement. It further recites the existence of the promissory notes and mortgage, that the parties wish to resolve all issues and disputes among them, and that “Nygren wants to sell and Cloutier wants to buy Nygren’s 15% stock interest in AMS.” The agreement acknowledges “the receipt, validity and sufficiency” of the consideration provided in the form of “payments, mutual promises, releases and agreements contained or referred to” in the agreement, and further acknowledges that all parties “have received independent advice from counsel with respect to the advisability of entering into this Settlement Agreement, have read the terms of the Settlement Agreement and have discussed those terms with counsel,” that all parties “fully understand ■and voluntarily accept the terms of this Settlement Agreement as a compromise of disputed claims . . . ,” and that “there has been no coercion involved in the negotiation or execution of this Settlement Agreement.”
The substantive terms of the settlement agreement span some twenty-four paragraphs over six pages. The principal provisions are as follows. Immediately upon execution of the agreement, Cloutier and AMS would deliver to Nygren’s counsel a check for $50,000, discharge of the mortgage on Nygren’s home, all three notes marked “paid in full,” a release of all claims against Nygren and Atlantic, and a signed stipulation of dismissal, to be held in escrow by Nygren’s counsel. At the same time, Nygren would deliver his stock in AMS, along with a release of his claims against AMS and Cloutier. Thereafter, for a period of thirty months, Nygren would pay AMS fifteen percent of the “net collected billings”[3] of Atlantic for “consulting services or other services of the type performed by AMS,” with Atlantic to make its records available to a named accountant for verification. The agreement further provides, however, that Nygren and Atlantic “shall not be obligated to continue to provide consulting services or other services of the type performed by AMS.” Ten days after the final payment, Nygren’s counsel would file the stipulation of dismissal.[4] All parties further agreed not to make any “false, disparaging or derogatory statements” regarding each other, or “otherwise interfere or seek to interfere with” each other’s conduct of business, and to keep the terms of the settlement confidential. In summary, AMS and Cloutier were to release their damages against Nygren, forgive his notes to them, release him from his noncompetition agreement, and pay him $50,000. In return, Nygren was to release his damages claims against them, relinquish his stock in AMS, and pay fifteen percent of the proceeds of his competition for a thirty-month period.
*497 Upon execution of the agreement, Cloutier and AMS delivered the check, canceled notes, release, and stipulation of dismissal, as provided. Nygren’s counsel held the stipulation of dismissal in escrow; Nygren received the other documents. At the same time, Nygren delivered his release and stock certificate, endorsed to Cloutier as agreed. Atlantic made the first two periodic payments under the agreement, one on September 22, 1998, of $10,140, and the second on October 9, 1998, of $15,384. At about that time, Cloutier delivered the discharge of Nygren’s mortgage, thus completing performance of his and AMS’s financial obligations under the agreement.[5] Thereafter, Nygren and Atlantic refused to make any further periodic payments, and refused access to Atlantic’s records upon request of the accountant as provided in the agreement.
Following these events, in March 1999, AMS and Cloutier amended their complaint in No. 97-6507, seeking to enforce the Settlement Agreement. Nygren and AMS then filed No. 99-2638, seeking to rescind the agreement on the ground of economic duress or coercion, reiterating the ear her claims, and asserting certain other new claims. AMS and Cloutier now seek summary judgment on their newly-pled claim for enforcement of the agreement, as well as on Nygren’s claim for rescission, and on all claims based on alleged events before the settlement agreement.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Corrections, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving parly bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Aparty movingfor summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson, 404 Mass. at 17.
An agreement to settle preexisting claims is enforceable in contract. “Such an agreement may be specifically enforced, and may be set up as an equitable defense in an action on the original claim.” Peters v. Wallach, 366 Mass. 622, 628 (1975); see also Lisbon Spinning Co. v. Worcester Tire & Co., 301 Mass. 437, 441 (1938). Such an agreement is voidable, however, if its execution was obtained by duress. International Underwater Contractors, Inc. v. New England Telephone & Telegraph Co., 8 Mass.App.Ct. 340, 342 (1979); Willett v. Herrick, 258 Mass. 585, 603 (1927).
To avoid enforcement of a settlement agreement or release on the ground of duress, the party asserting duress must show that “[ 1 ] he has been the victim of a wrongful or unlawful act or threat, and (2) such act or threat must be one which deprives the victim of his unfettered will... As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values . . . The elements of economic duress have also been described as follows: ‘(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; (3) that said circumstances were the result of coercive acts of the opposite party . . . Merely taking advantage of another’s financial difficulty is not duress. Rather the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion . . . The assertion of duress must be proved by evidence that the duress resulted from the defendant’s wrongful and oppressive conduct and not by plaintiffs necessities.’ ” International Underwater Contractors, Inc., 8 Mass.App.Ct. at 342 (citations and internal quotations omitted).
A parly seeking rescission based on duress must demonstrate that the other’s conduct “caused him to enter into the contract under the influence of such fear as precludes him from exercising free will and judgment.” Coveney v. President & Trustees of the College of the Holy Cross, 388 Mass. 16, 22 (1983), quoting Avallone v. Elizabeth Arden Sales Corp., 344 Mass. 556, 561 (1962). Moreover, not every fear having that effect will suffice; the fear involved must arise from “pressures applied unlawfully or wrongfully.” International Underwater Contractors, Inc., 8 Mass App. Ct. at 342. Neither threats to take actions that are not wrongful or unlawful, nor such actions themselves, constitute duress such as to support rescission or excuse nonperformance. Id. at 346. Absent compelling circumstances, the availability of a reasonable alternative, such as a legal or administrative remedy, will defeat a claim of duress. See Ismert and Associates v. New England Mut. Life Ins., 801 F.2d. 536, 549 (1st Cir. 1986); see also Delaney v. Chief of Police of Wareham, 27 Mass.App.Ct. 398, 408 (1989). In applying these standards, the Court must be mindful of the “well established policy favoring the private settlement of disputes.” Ismert and Associates v. New England Mut. Life Ins., 801 F.2d. at 550. That policy dictates a strict interpretation of the concepts of involuntariness, coercion, and lack of alternative.
The facts of Underwater Contractors, Inc. v. New England Telephone & Telegraph Co., 8 Mass.App.Ct. 340, illustrate the standard. There the plaintiff offered *498 evidence that it had entered into a contract for services to be performed for the defendant, that through assurances of payment the defendant had induced it to perform work costing several times the original agreed price, that the plaintiff had continued to perform the work in reliance on repeated assurances of payment, that representatives of the parties had reached a final agreement for payment, but the defendants’ board refused to approve payment in that amount, and that ultimately the plaintiff had accepted an amount substantially less than that previously agreed, tendered by the defendant on a “take it or leave it basis,” because the long delay in payment of such a large amount had forced it into a position in which “it would not have been able to survive the demands of [its] creditors." Id. at 344. The compromise occurred, and the plaintiff gave its release, prior to the initiation of any litigation and, so far as appears from the Appeals Courts’ decision, without the involvement of any counsel for the plaintiff. This evidence, the Appeals Court held, was sufficient to establish a genuine dispute on the issue of duress.
The facts of Ismert and Associates v. New England Mut. Life Ins., 801 F.2d. 536, in which a divided panel of the First Circuit applied Massachusetts law to affirm the grant of summary judgment rejecting the claim of duress, are in contrast. There the plaintiff had released claims arising from the termination of an exclusive marketing agreement, in return for renegotiation of a debt that it was otherwise unable to pay, allegedly as a result of the creditor’s wrongful conduct in terminating the relationship and leaving it without income. In rejecting the claim of duress, the majority stressed that the release was the product of arms length negotiations between counsel, that the plaintiff had accepted the benefits of the renegotiation, and that the plaintiff had had the alternative of litigating its claims, and of asserting defenses to the anticipated loan collection efforts in the litigation context. Id. at 548-50.
In this case, the parties entered into the settlement agreement in the context of pending litigation, after negotiations conducted through litigation counsel. The agreement itself, executed under seal by all parties, recites that each party entered into it voluntarily and free of any coercion, with independent advice of counsel, and further acknowledges the adequacy of the consideration exchanged. Moreover, Nygren repudiated the agreement only after having received and accepted virtually all the benefits of it. In this context, to permit Nygren to disavow his recitations and acknowledgments, so as to try the issue of duress, would severely undermine the policy favoring settlement of disputes, and would call into question the reliability of virtually all agreements to settle litigation.
Nygren claims that by wrongfully terminating his employment, thereby cutting off his income while at the same time causing his notes to become due, Cloutier and AMS put him in such a precarious financial position that he could not afford to litigate the various disputed claims between the parties, and had no choice but to settle. He characterizes the notes and the noncompetition agreement as of dubious validity, while placing substantial value on his foregone compensation from AMS, as well as on the fifteen percent share of Atlantic’s proceeds that he agreed to pay AMS; thus, he contends, the settlement agreement involved a disproportionate exchange of value, which he accepted under financial compulsion.
Although Nygren’s affidavit reflects considerable effort to cast his allegations in terms of the elements of duress recognized in International Underwater Contractors, Inc., he offers little in the way of specific facts to support the characterization. His claim of economic hardship rests on his own assertions that “[a]t the time of the settlement I was on the verge of financial ruin” and that “I could not pay my creditors, my lawyer, my mortgage or even Cloutier’s dubious notes.” He does hot, however, provide specific support for or documentation of these assertions, such as evidence of default on debts to other creditors, refusal of credit, or unwillingness of his counsel to provide continued representation. He does not identify his assets or other debts, nor does he indicate what income he was receiving, or had the opportunity to receive, from Atlantic or from any other source at the time of the settlement.[6] Nor does Nygren provide any hint as to what has changed to enable him to proceed with litigation now.
Nygren also fails to provide specific facts to support his contention that Cloutier and AMS caused whatever financial hardship he had. He admits to a gambling problem, for which he does not suggest that Cloutier or AMS had any responsibility. He blames AMS for his tax liability, but offers nothing to indicate that any conduct on its part prevented him from anticipating and providing for his tax obligations through the mechanisms that are routine among persons who receive payment as independent contractors. He points to his allegedly wrongful discharge and resulting loss of income, but fails to indicate to what extent the lost income was replaced by his income from Atlantic.
In this context, Nygren asserts that “[m]y ability to work was threatened by Cloutier’s stated intention to file yet additional litigation regarding a very questionable noncompete." As the authorities cited supra indicate, however, duress requires a showing of compulsion resulting from wrongful or illegal conduct; fear based on a threat to assert a well-founded legal claim is not sufficient. Delaney v. Chief of Police of Wareham, 27 Mass.App.Ct. at 407. The threatened suit for violation of the noncompetition agreement, as described in Nygren’s affidavit, would have impaired Nygren’s ability to work only if it were successful — that is, if a court determined that the noncompetition agreement was valid and enforceable. The bringing of *499 a suit that a court determines to be well-founded could hardly be characterized as wrongful.[7] See Ismert, supra, at 549.
Nygren’s effort to characterize the settlement agreement as a disproportionate exchange of value suffers from similar weaknesses. The settlement agreement involved the exchange of two distinct types of consideration: First, each party gave up the right to pursue the disputed claims asserted in the litigation, in return for the opposing party’s relinquishment of corresponding disputed claims. Second, each party gave the other certain benefits of present economic value. The latter category includes, on AMS and Cloutier’s side, payment of $50,000, the cancellation of the notes, and assent to Nygren’s competition, and on Nygren’s side, the transfer of his stock, and the promise of periodic payment of fifteen percent of Atlantic’s “net collected billings” for thirty months.
In order to reach a full and final determination of the value of the exchange, the Court would have to resolve the factual disputes underlying the disputed claims, so as to determine the likely outcome of litigation of those claims. That would require, in essence, a trial within a trial, imposing on the parties all of the burden and expense that they sought to avoid by their mutual release of those claims. This Court does not read the authorities discussed supra as requiring, or authorizing, such a procedure. In this respect, it is noteworthy that the showing of disproportion in International Underwater Contractors, Inc., supra, rested heavily on evidence that the defendants’ own representatives had agreed to an evaluation of the claim that exceeded the amount of the settlement by two hundred thousand dollars, more than a third of the total. As in Ismert, the evidence Nygren offers here lacks any “counterpart... to the negotiators in International Underwater who allegedly agreed with the plaintiffs valuation of its claim.” Ismert and Associates v. New England Mut. Life Ins., 801 F.2d. at 550. Absent such evidence, what remains is that each party gave up the right to pursue claims of uncertain value, based on disputed facts, and that each in return received a release of similarly disputed claims, of similarly uncertain value, while avoiding the burden and expense of litigation. The record establishes no disproportion in this exchange.
The record similarly fails to show disproportion in the other elements of the exchange, despite some uncertainty in valuation. Although Nygren questions the validity of the canceled notes, as discussed supra, he provides no grounds for any question as to two of the three notes, and as to the third, he offers no evidence that the contractual condition of its forgiveness was ever met. Nygren offers no evidr nee of the value of the stock in AMS that he transferred to Cloutier. The value to Nygren of AMS’s assent to his competition is uncertain, as is its cost to AMS, but the agreement itself accounts for that uncertainty by making Nygren’s payments dependent on whether he chooses to continue in such competition for the thirty-month period, and if so, the degree of his success.[8] Overall, the record fails to establish a likelihood that Nygren would be able to meet his burden of proving that the exchanges provided under the settlement agreement disproportionately favored Cloutier and AMS.
Having failed to offer specific, admissible evidence of the elements of duress, Nygren is bound by the settlement agreement, and is precluded from further litigation of all claims encompassed in it. Accordingly, AMS and Cloutier are entitled to judgment as a matter of law as to liability on the single count of their second amended complaint. Determination of damages on that count will require review of Atlantic’s financial records, and accordingly must await further proceedings. The parties are directed to confer in an effort to reach agreement as to such review of records. Failing agreement, AMS and Cloutier may seek interlocutory injunctive relief by motion pursuant to Rule 9A. As to No. 99-2638, AMS and Cloutier are entitled to judgment as a matter of law on counts I through VI insofar as each of those counts is based on alleged conduct prior to the settlement agreement.[9]
CONCLUSION AND ORDER
For the reasons stated, Plaintiffs’ Motion for Summary Judgment of Liability in No. 97-6507, and Defendants’ Motion for Partial Summary Judgment on Counts I through VI of the Plaintiffs’ Second Amended Verified Complaint in No. 99-2638 are ALLOWED.

 Docket no. 97-6507 comprises three cases originally filed as Middlesex nos. 97-6507 and 97-6663 and Essex no. 97-2509, consolidated into Middlesex no. 97-6507 by order of the Court dated May 22, 1998.

 Nygren’s affidavit attributes his gambling to obsessive-compulsive disorder, as diagnosed by his psychiatrist. The psychiatrist’s diagnosis and opinion of causation are inadmissible hearsay, and the Court does not consider them. The Court also disregards, as inadmissible parol evidence, certain portions of Nygren’s affidavit that apparently attempt to contradict provisions of unambiguous written agreements.

 This term is defined in the agreement, with provision for exclusion of amounts for operating expenses.

 The parties did not report the settlement to the Court, nor did they seek a stay of the action, or otherwise solicit the court’s approval of its continued pendency, in a dormant state, for a thirty-month period. It appears that the present dispute arose before the scheduling of any event, such as a pre-trial conference, that would have required a report to the Court.

 Certain continuing obligations remained, such as the undertakings of all parties to refrain from disparaging the others and from interfering with each other’s business, and to hold the terms of the settlement confidential.

 There is at least considerable tension, if not outright inconsistency, between Nygren’s claim of near destitution as of the time of the settlement, and his assertion that his agreement to pay AMS 15% of Atlantic’s proceeds for thirty months “could likely result in a payment by me of anywhere from $600,000 to over $1,000,000''; if Atlantic was, or was likely to be, that successful, then it could be expected to *500 provide Nygren with income sufficient to support litigation of his claims and defenses to conclusion.

 While repeatedly characterizing the noncompetition agreement as "dubious” and “questionable,” Nygren offers no specific facts to support those characterizations. He does not suggest that he was under any duress either when he entered mto the noncompetition agreement in 1993, or when he reaffirmed it in 1997. The undisputed facts indicate that Nygren was a high-level employee receiving substantial compensation, and that he received ample consideration for his 1997 reaffirmation of the noncompetition agreement. Neither the two-year term of the agreement, nor its geographic scope, appears unreasonable in light of the nature of the business. On the record presented, no ground appears on which Nygren could have challenged the noncompetition agreement successfully.

 As noted supra, Nygren offers no facts to support a challenge to the validity of the noncompetition agreement.

 Among those Counts, only count V. appears intended to allege conduct both before and after the settlement agreement.